case. Ms. Watson, would you like to call that case, please? All right. Well, counsel on Castillo, please approach. Please identify yourselves. Tell us who you represent. Good morning, Your Honor. My name is Brian Reyna. I represent the appellant, Johnny Castillo. All right. Good morning. Brian DeGiovese. I'm the state's attorney on behalf of the people. All right. And, Mr. Reyna, how much time would you like? I would anticipate more than 15 minutes, if I could just reserve 5 minutes in rebuttal. All right. And Ms. Gibbs? Fifteen minutes. Okay. All right. And, Mr. Reyna, whenever you're ready, please proceed. May it please the Court, this is a case, Your Honors, in which the state failed to prove beyond a reasonable doubt that Mr. Castillo, who is a law-abiding citizen before and after this incident, knowingly caused the death of the decedent, William Jimenez. On the night in question, Mr. Castillo and his co-defendant, Christopher Rodriguez, were teenagers minding their own business when Jimenez, a highly intoxicated 35-year-old Latin king, approached and taunted Rodriguez for no apparent reason. Rodriguez chased and tripped Mr. Jimenez, who landed face-first on the ground. Mr. Castillo and Rodriguez kicked and punched Jimenez and fled the scene. Now, Mr. Castillo said in his statement that his co-defendant threw Mr. Jimenez to the ground, right? That's correct, Your Honor. There's a, Mr. Castillo's statement says, threw the one eyewitness who didn't give much of a description of the event at all, did say tripped. Either way, I don't think it changes my argument in any way. It's well recognized that kind of hand-to-hand combat, death was responsible. Where is the hand-to-hand combat? The record shows that Mr. Jimenez did not respond at all, did not move at all. He just laid there on the ground, isn't that correct? So where's the hand-to-hand combat other than by the defendant and his co-defendant? Well perhaps hand-to-hand combat was not the correct phrase. Use of hands is what I mean. Well only the use of their hands, but it was also their feet. Right. He didn't, Mr. Jimenez was on the ground. There was no testimony or any evidence that he did anything to defend himself. Well Your Honor, this is a case where when we're talking about involuntary manslaughter, we don't need mutual combat or this isn't a self-defense case, it's not a second-degree murder case. This is involuntary manslaughter. So we know that the law allows basically for a deliberate act under involuntary manslaughter that the act can be deliberate, but just embodies a reckless disregard of the consequences, which is exactly what happened here. Whether it was a throw or a trip, either one, it was a deliberate act done by the co-defendant, which Mike Klein is accountable. That caused him to fall face-first to the ground. Now And your theory is that the injury that Mr. Jimenez sustained by falling to the ground was the injury that ultimately led to his death. Was the trial court required to accept that theory, or could it, based on the evidence, have found that it was the blows to the head delivered by feet that caused him to be in a coma from which he never recovered? Speaking generally, the court could have found that. However, what we have here, the most critical evidence in this case is the medical evidence, and the Which turned out to be a homicide. Well, that's correct, Your Honor, but the medical examiner testified that the 1998 report showed no external injuries on Mr. Jimenez. But we know he was bleeding, right? Because we know there is blood on defendant's clothing. We actually, we know he was bleeding. A police officer testified he was bleeding, I should say, when the officer arrived at the scene, which was well after the actual incident occurred. So even if it was several But wasn't there blood on the clothing of the defendant? There was a witness who testified he saw the co-defendant with a small amount of blood on his shoes and shirt. There was no blood evidence introduced. There was no DNA. We don't have the shoes. We don't really know the extent of any blood. But does it really matter whether there was blood or not? Are you saying that that's the key difference between recklessness and first-demeanor? The key difference, really, is the extent and the nature and severity of the beating. But wasn't this pretty severe in that he never woke up from the coma? The ultimate consequences are obviously very severe. But we know, we have very little evidence of what actually happened. And the strongest evidence of what happened is these external injuries. And so taking Wait, the external injuries or the internal injuries? The external injuries, because any time you're kicked and punched, you're going to have bruises and lacerations and broken bones. That is really what distinguishes this case from other cases in Illinois where kicking and punching have been found sufficient to prove knowing murder, is that all of the, in the cases cited in my brief, Brackett, Castillo, Miramontes, the decedents all suffered severe external injuries, which evidence is a brutal, severe beating. But you don't need, again, the cases law doesn't say that you have to have external injuries. Correct. Is that correct? The case law says you have to have evidence of a severe beating. And the evidence we have here of the beating is that to whatever extent they kicked and punched Mr. Jimenez, they caused not even a bruise. Well, we don't know that because I didn't think that there was direct testimony about that by the expert for the state. Well, the medical examiner did testify that there was no evidence of external injuries in response to questioning by the judge, in fact, in the 1998 report. And additionally, you know, the state didn't introduce any photographs of any injuries, any bruises. So, you know, it was the state's burden to prove the severity of the beating and they really didn't do that here. And the fact that Mr. Jimenez did ultimately suffer severe internal injuries was not really a foreseeable consequence of punching and kicking. No, in the head? No, Your Honor. Not when we have evidence showing that whatever these kicks were not delivered with the force that could even cause a bruise to the head, not a broken jaw, not a broken bone. Again, so you're saying that without external injuries, it has to be recklessness. I don't see any case law that says that. In this case, Your Honor, because, I mean, it's a factual determination that's made on a case-by-case basis, right. But in this case, we also know that the judge considered in the severity of the beating and nature of the beating evidence that was inadmissible. That is a hearsay statement by the judge. Well, the judge multiple times said that he was only treating the evidence for the one defendant separately from the evidence for the co-defendant. He said it several times. And even with regard to the one statement that you might be able to say something about, if you look in the context of a total statement by the judge, it does not say what you say it says. Well, Your Honor, the judge, it's one thing to say you're not going to consider something, and it's another thing to consider it. Well, how do you know he considered it? We have evidence on the record here that he said, you know, he's rejecting the statement on, it's actually quoted on page 28 of the State's brief. The judge is addressing the defense counsel's argument that the beating was not proven to be brutal because of the absence of external injuries. And he said, that's a good argument, but I'm rejecting it because what we know here is that the defendant stomped, these teenagers, stomped the decedent. And that's a hearsay statement. Well, isn't the defendant just had a fair characterization of what they did, regardless of what the co-defendant said, which the trial judge, again, as Justice Hyman noted, said several times. I'm not going to consider this against Mr. Castillo. But after hearing the evidence, couldn't he come to the conclusion that this is what the defendants did? They stomped this man. No, Your Honor. There's no evidence of stomping that was admitted against Mr. Castillo. The only evidence of stomping came from testimony that was found to be inadmissible in his case. No, but you're talking about the co-defendant's statement in which he admitted, we stomped Jimenez. But after hearing the evidence, including the evidence that Castillo and his co-defendant kicked Jimenez multiple times while he was on the ground, not responding, couldn't the trial judge conclude, based on that evidence, that they stomped him, regardless of what the co-defendant said? I don't believe so, Your Honor. I mean, there's evidence of kicking and kicking and stomping are distinct acts, and even the judge considered them to be distinct acts. And the external injuries are not consistent with stomping. I mean, in cases where there's stomping, there's usually severe lacerations to the head, exposing of the skull, damages to the skull. Just none of that happened here. We don't have evidence of any severely forceful blows. It's a very – we don't really know, actually, how long the incident took, but by all accounts, it hadn't transpired in a short amount of time, was not very severe. Excuse me? Didn't the judge's findings pertain to both offenders? The judge didn't parse out really who he was talking to. Exactly. He says they and them and so forth. So for you to say, well, because of that, this had only – he applied testimony that went against the co-defendant to defendant seemed like quite a reach. Well, Your Honor, if the State is admitting that the judge considered the stomping evidence against both defendants, they're admitting that the judge improperly considered – Well, they didn't say that either. Well, it is – Neither did the judge. The judge, again, is talking about both of them, but he didn't say with regard to defendant that he was considering – in fact, he said just the opposite over and over and over throughout the trial beginning – at the beginning of the trial, so that he understood that – what evidence would be to one another. And there's a presumption, because it was a bench trial, not a jury trial, that he follows the law. So you have a very high hurdle to overcome. Well, Your Honor, the Court made this statement about stomping when rejecting defense counsel's argument about the absence of external injuries, not the co-defendant's counsel's argument of external injuries. And this isn't a case where we need to infer that the judge considered inadmissible evidence. It's in the record. He's saying, you know, that's a good argument about the external injuries, but what overcomes that, what really tipped the judge here, was the stomping. The judge said, but because these teenagers, these kids, stomped this man, I find it – the beating sufficiently brutal to prove knowledge. So that is extremely prejudicial and warrants a new trial on its own. I mean, just given the fact this was the case, I wouldn't consider it. But it's in the record that he did. You know, it could have been a lapse of memory, a lapse of judgment. There are continuances between proceedings. When all is said and done, it's on the record that he's considering it. And not only is he considering it, he's considering it in rejecting Mr. Castillo's argument. So some other factors here that also show recklessness are the absence of weapons, the establishment of a time frame for the incident, and the fact that Mr. Jimenez instigated this by taunting and talking basically gang trash to two teenagers. Well, he walked away. Wait a second. I'm having a hard time with saying, you know, I don't like your gang or your gang is wimpy or whatever. It's instigation of a situation where the victim is thrown to the ground and kicked by two people. I mean, gangs by their nature are violent against each other. Mr. Castillo was not a gang member. He's not in a gang. But the co-defendant was. So when you have a gang member approach another gang member and start talking gang trash, the point is to start a fight basically. There's a case I cite in the brief of Jaime's, Jamie's, where basically flashing gang signs was sufficient to instigate a feud. Mutual combat. But he walked away. The victim walked away. He didn't stay and continue to provoke a fight. He said something nasty and then walked away. Right. This isn't a self-defense case, Your Honor. They chased him to kick him. They did. And again, even for involuntary manslaughter, this could be a deliberate act that even was intended to cause some harm. It's the difference between, okay, these kids did something stupid, knowing that this is basically like a fight-type situation, a high They kicked and punched the guy. They're not, they're not, this is not a commendable action on their part. I understand that. They chased and kicked and punched a man who was down. He wasn't defending himself. He wasn't responding. And they kept kicking and punching. Mr. Castillo in his own statement says that he left as soon as he realized that he wasn't responding, which is just one fact among some others that makes this case very similar to L'Engle. In that case, the defendant stopped punching his father when he saw the bleeding. Here, it's the same thing. And he got help, didn't he? Well, he did, but again, that He walked away. He didn't get any help. He didn't call the police. He didn't check on him. He didn't do anything. Your Honor, for involuntary manslaughter, it's required that you have a reckless disregard for the consequences. You're using this case with the father as supporting your position. All I'm saying is the facts are very different there from what you're presenting. Well, that particular fact is different. That's a very big fact. Well, that's an adult defendant at the same time. We have two kids who, by their nature, are less culpable and more likely to act in a reckless manner. And the fact that they did disregard the consequences of their actions is evidence of involuntary manslaughter, that they basically performed acts that are typically not associated with causing death or great bodily harm. Kicking somebody in the head? Yes, Your Honor, that's correct. Kill the right patches, apparently? You said he walked away when he knew he wasn't moving. So, that's a pretty bad beating. And when there's no, the man is defenseless. He didn't respond at all to any of the kicks or the beating. Your Honor, we really don't know what he responded to. Well, don't have any witnesses. Basically, didn't really see much. So, you know, if this were... Was there any testimony that he defended himself? No, but it's also not required that he defend himself. I mean, this is, you know, I'm not trying to... But you're saying it's like a high school beat down, you said. I don't see that at all. This is not high school. This is going after somebody very viciously in the head and the body when the man's not even moving, or defending himself, where they went after him. Your Honor, in cases where the defendants have found to act viciously through stomping or kicking or punching, there are bone damages, severe lacerations, abrasions, bruises. We have none of that. None of that here. So, and we also have an alternate explanation and a very unusual manner of death. We know that the decedent landed face first and there was testimony that he would have trouble clotting blood based on his severe alcoholism. So this is similar to Lengel in that in Lengel, the defendant beat his father, which caused high blood pressure, which caused a stroke, which led to death. I don't remember the examiner saying anything about how the alcohol had an effect on the brain damage. She did testify to that, that the alcoholism and high blood alcohol content would possibly impede the ability to clot blood. I believe, actually, that was again in response to questioning by the judge. But he didn't die because he couldn't clot. He died from the injury to his brain. He did. He died 13 years later and the medical examiner found it was related to the injuries. But that is not a really foreseeable result of kicking and punching somebody that they would die 13 years later. This man was also in and out of hospitals for 12 years, suffered infections based on the medical equipment. He never recovered from the beating, unconsciousness, right? He never became conscious at all at any time. That was somewhat disputed. I mean, his wife testified that he was able to communicate. She fought. She fought. He blinked. She fought. There was also testimony that he was, I believe, taken off of a ventilator and was communicating before he was released from the first hospital. And then his condition basically got worse based on some of these infections that occurred throughout the course of 12 years that he was. All the result of what defendant and co-defendant had done to him. Yes, this stupid thing that, you know, my client did. Well, a lot of times things are stupid, but that doesn't make them reckless. But it also doesn't mean that they knew quite the extent of the damage they were causing. I mean, we have reckless kids who are punching and kicking someone. They had to know that they were doing great bodily harm. That's what they had to know, right? Well, I disagree that they had to know that. I mean, they probably knew that they were causing some harm. But some harm or bodily harm is different than great bodily harm. Great bodily harm for murder needs to be pretty severe harm to the extent it can lead to death. It is, but it's not a typical situation. It's a pretty unusual case. It's not often. I've been doing this for 10 or 11 years. I've certainly never seen a case where somebody dies as a result of a coma induced by punching and kicking 13 years later. It's just an unusual fact situation. And the death in this case was really more tenuous than that in L'Engle, even, where the defendant's father died just two days later. It had nothing to do with the beating, though. Well, it did, Your Honor, because the beating caused the high blood pressure, which caused the stroke, which caused the death. And here we have a beating that caused internal bleeding, which caused a coma, which caused death. So causation is very similar between the two cases. And, again, the only evidence of a really severe beating is this inadmissible hearsay testimony, inadmissible hearsay testimony about stomping, which isn't really supported by the physical evidence and was improperly considered against Mr. Castillo. Ms. Rainey, you keep calling these a couple of kids. Mr. Castillo was 19 years old at the time. Yeah, he was a teenager, Your Honor. Well, our Illinois Supreme Court just drew the line at 18, so not a kid. Well, he's still a teenager. I mean, he's 19. That's a teenager, perhaps not a juvenile under Illinois law, but a teenager nonetheless, a young adult. You know, there have been cases where the first district – Certainly not a juvenile. No, but a teenager, a young man, a young kid. I mean, this isn't somebody who's fully developed brain-wise in maturity or ability to recognize consequences. There have been other cases where appellate courts have applied kind of the Miller-type sentencing principles to a 19-year-old's house, for instance. And the co-defendant, who actually did the – there's evidence that he did the kicking to the head, was only 17. The medical records from the 1998 hospital showed blonde head trauma, excessive scalp swelling, hematoma. They were pretty clear about the injury to his brain. Right. In 1998. Right. So notwithstanding the fact that he didn't have a lot of external injuries that weren't identified in that, it's clear that there were internal injuries in his brain. Right, but those are not injuries that the defendants would have – That were documented in 1998. Yes, but the defendants wouldn't have been able to see that. I mean, the importance – one of the important things about the external injuries is that it's evidence to the people involved, the co-defendant and the defendant, of what type of injury they're causing. The question is, did they know they're causing great bodily harm or death? That, I think, is a pretty steep hurdle for the State to prove. And if you're two teenage kids punching and kicking a guy for a brief period of time – Please stop referring to Mr. Castillo as a teenage kid. He may have been 19, but he was not a teenager. He was not a kid. He was a 19-year-old adult. Okay. I apologize, Your Honor. I'm not trying to imply he was a juvenile under Illinois law, but he is a young adult and somebody whose brain was perhaps not fully capable of recognizing the consequences of his actions. Kicking somebody has consequences. It does, but the normal consequences of kicking somebody is not death or great bodily harm. The State is unable to cite any case where there is a death caused by kicking where there are no external injuries. And here that's really – Well, I keep saying that, but let's look at the – I don't think that's what the law says. Well, it's not also – it's not what the expert testified to. What the expert said that she was unable to, this is a quote, quantify either from her external examination, her internal examination, or her review of the records, how many injuries, particular injuries were sustained by Mr. Hernandez in connection with this event. So it's not clear. The expert said she doesn't know. There could have been, but she's unclear. So, you know, you keep saying there's none. That is not what she testified to. Well, Your Honor, the portion of the record you just quoted is the medical examiner's testimony about her autopsy, which occurred 13 years after the incident. But she said she looked at the records. Right. Right. So she was unable. That's what she said. Well, the judge actually specifically asked her. Yes, and that was her answer. That's what I was reading. She said she didn't see any in there and she might have missed something. I'm saying there's a different portion of the record in which she says she doesn't recall seeing any evidence of external injuries. But she also says she was unable to find anything. So that – but you're saying, well, that means there's none. That's the big difference between how you're characterizing her testimony and what her testimony said. That's the only thing I'm asking you about. Okay. Your Honor, the bottom line is the State needs to present the evidence of, you know, a severe beating, which is typically done through proof of external injuries. Or internal injuries. There's nothing that says you can't have proof by internal injuries without any proof whether or not there were external injuries. I mean, you're saying the law is without external injuries, it's reckless. Is that what you're saying? No, Your Honor. Okay. I'm saying here the strongest evidence of whether the defendants would have known that their actions were so severe that they would cause great bodily harm or death is the evidence of the external injuries. Because – And so that's the argument you made to the trial judge. You said it's not as if his head split open in response to one of these blows and we saw brain matter. How would we know that kicking him in the head would ultimately lead to his death? But that was the issue that the trial judge had to decide. If this was a jury trial and you were arguing that the trial judge erred in not giving the involuntary manslaughter instruction, we'd have a different issue. But here it was the trial judge who had to decide. Was this reckless or was it intentional? He found intentional. And I think what I hear you saying is he had to find it was reckless because there wasn't blood and brain matter all over the place. I'm not aware of the case that says that. I'm not arguing that, Your Honor. I'm arguing that the State has to prove a severe beating to show that these kids – excuse me, I'm sorry, Your Honor, I didn't mean to say that – to show that Mr. Castillo at 19 would have known that his or the co-defendant's actions were likely – were practically certain to cause great bodily harm or death. And the strongest evidence of what they would have perceived at the time are the external injuries. But you don't – like when you kick somebody who's clothed face down on the ground and you break their ribs or you fracture their neck or whatever, you don't see that. It's broken – you talk about broken bones, but you don't see the broken bones. But you know pretty well if you kick them when they're down, that's likely to happen. Well, Your Honor, you bring up a good point with stepping on the neck because that is actually what happened in the Jones case where the defendant deliberately stepped on the decedent's neck. You didn't kick him. You stepped on him. Correct. Which ended up killing him. I mean, he also beat him in addition to that. But the court found that that was not really a foreseeable – naturally foreseeable consequence of stepping on somebody's neck. In the same regard, I understand that punching and kicking somebody is likely to cause harm. I mean, it is – this isn't – again, these kids aren't to be commended for their actions. This was something that they shouldn't have done. It was wrong. But it was not practically certain or they could not have been practically certain that they would have caused great bodily harm and death. And you bring up the point of the trial judge making the decision that the external injuries were not enough to show that this was reckless. But the judge specifically relied on testimony about stomping that was not admitted in this case to come to that conclusion. Well, again, the law is that the defendant's state of mind can be shown by other factors than just what you're saying, the external injuries. For example, the character of the defendant's acts, the nature and seriousness of the victim's injuries. And if you look at those, in addition to whatever else you would look at, the judge could absolutely come to the conclusion that he came to, that this was something that they knew, great bodily injury. In fact, I mean, why else would they continue to do that when the man is lying defensive and not reacting? Well, the evidence was that they left. I mean, this was not – No, after the – he never responded. There's no testimony that he ever responded to. Right. But, I mean, this evidence circumstantially shows that they're not standing around for a long period of time just wailing on this. Well, you don't have to. If you hit somebody in the head and kick them and beat them about the body, the man doesn't move at all. Then you think, well, we've done a good job here. For instance, sir, if there's one punch, if somebody just punches somebody one time or kicks somebody once, it's pretty well recognized in the law that somebody wouldn't expect great bodily harm or death to result from that. I mean, here we know this was quick, and we don't even know the state never established how many times a person was kicked or punched. You know, it could have just been one, one, one. Well, we don't have testimony. We don't know. Do we have testimony that it was once? I mean, what? We have no evidence of what it was is the problem. I mean. There's no evidence that there was more than one kick is what you're saying? Well, the statements, my client's statement does seem to. That's what I'm referring to, yes. Say there was more than one. But we really don't know. I mean, we don't know how many. Well, but even your client can see there's more than one. So that doesn't, you seem to be stretching what you hear. I was just trying to make an analogy basically with the kicking and punching because, you know, there's no case in Illinois where kicking and punching that didn't cause external injuries was found to be a knowing murder. You know, the state doesn't cite one, and I certainly didn't find any. This would be different than every case I saw in Illinois where kicking and punching has led to finding a knowing murder as opposed to recklessness. And, you know, I do think that the age of the defendants in this case is something that you should take into consideration as well. In all of these cases, the defendants were adults and were found, you know, even in L'Engle, the man was an adult. So I think we have inherently less responsible people doing something that is generally considered an action that would not result in death or great bodily harm. All right, Mr. Romano, we'll give you a few minutes in rebuttal. Thank you, Your Honors. Ms. Gibbs. Good morning again. Brenda Gibbs, Assistant State's Attorney on behalf of the people. The evidence in this case is clear from the circumstances of the incident, the character of defendants' acts, and the severity of the injuries that this was first-degree murder. We have a victim who approached defendant and co-defendant and argued with co-defendant after they began yelling at each other and the victim ran away and he was chased by both defendants. Defendant saw co-defendant throw him to the ground, saw this victim laying on his face, and then joined in co-defendant in kicking and punching this man and continued to do so past the point he was bleeding and to the point he was no longer moving. And we know that he was bleeding because co-defendant's uncle, who saw co-defendant leaving the scene shortly after the incident, saw blood on his pants and shoes. And he said it was a little bit of blood, but he also said that he was concerned that co-defendant may have been injured based on this blood that he saw. While defendant and co-defendant were kicking the victim, the victim was not moving. He was not fighting back. How do we know he's not fighting back? How do we know? We don't know how many kicks he received. Forgive me for being the grammar police, but when the defendant made his statement to the police, he said that he was kicking him also and said that he stopped kicking him when he was no longer moving. Kicking is an active verb, so that implies more than one kick. The injuries of the victim also suggest that there was more than one kick. The injuries included blunt head trauma. And the medical examiner testified that that was noted in the physical assessment, which suggests that the first responders or the person at the hospital saw this. It was a physical assessment. They're looking at what they see. They see blunt head trauma. We also have an extensive right frontal parietal swelling of the scalp. The scalp is an outer portion of the head, not an inner portion. So they could see the swelling. Well, swelling, I think Mr. Reina's point is swelling happens after the fact. When you're kicking somebody, they don't immediately swell up. And so because we didn't see blood and broken bones and whatever, how would we know? Your Honor, I would suggest that these are two young men, 19 and 17. They have jobs. They understand consequences. They have some common experience. And when we look at the common experience of everyone, you protect your head when there could be an injury. We have motorcycle helmets. We have football helmets. We have boxers who wear headgear to protect the head. So when you're kicking someone in the head, it's just common experience and common sense that that can cause a severe injury. Additionally, the injuries included a hematoma, which is bleeding over the brain, and a diffused axonal shearing injury. The medical examiner explained that a shearing injury occurs when there's blunt force that causes the cells to be sheared apart. So that speaks to the number of the kicks because there had to be, I would suggest, more than one to cause that blunt force to cause the shearing. It also speaks to the force that was used. The victim suffered from severe brain damage and never had any substantial recovery from his injuries. His wife testified that from the time of the incident until he passed away, he never regained consciousness. He breathed through a trach tube. He was fed through a feeding tube. He had waste eliminated from his body through a catheter. And in her heart of hearts, she believed that he was blinking. But he was not able to go to a rehabilitation center because he was unable to communicate. That speaks to the severity of these injuries. Going back to the defendant's knowledge of what they were doing, this man was bleeding from his face and his head. Again, the head is an area that we protect because it's subject to, when you're kicking it, it's subject to, you know, harm. It can cause a lot of damage. You see blood from a person's face and head. That should key you in that something bad is going on. That also speaks to the existence of an external injury. The medical examiner testified that the victim died from cerebral injuries due to an assault and the manner of death was homicide. That contradicts defendant's position that this man was injured when he fell. What also contradicts that is the medical examiner's review of the post-mortem brain exam. The report indicated that he had swelling in the orbital frontal lobe, which is the area above the eyes. And he had a greater amount, I'm sorry, he had bruises in the orbital frontal lobe on his death. He had greater bruises on the right-hand side. If there was an injury from falling on his face, if in fact he fell directly on his face because a person who had a .243 blood alcohol contact is more likely to crumple to the ground and not fall directly down. But if there was an injury from falling straight down, that would have been indicated, I'm suggesting, by the bruising across the frontal. The kicks seem to have been on the right-hand side. And again, it was a shearing injury. So falling, bruising the front of your head is different than having kicks to the right side of your head and having shearing injury. So that suggests that the fall did not cause the death. And also, the medical examiner did not testify that the fall caused the death. She was there discussing it. She could have been questioned and it could have been asked and answered by a defendant as far as whether that was the cause. But she testified he died from this assault, not from the fall. So what about the trial judge's mention of the word stop? Mr. Reynos says that's different than finding that both defendants assaulted Mr. Jimenez. Your Honor, in the context of the trial court's mention of the word stomp, it is evidence from my review of the record that he was discussing what occurred to this victim. He said the victim was beaten and kicked and stomped. And that was an accurate characterization of the evidence because defendant's statement said that he was beaten and kicked, as did co-defendant's statement to police. And co-defendant's statement to his uncle said he was stomped. So that was a fair characterization of what happened to the victim. Now, the difference between a stomp and a kick, I would submit, is the audience. When the victim, I'm sorry, when co-defendant, and I'm not referring to this in terms of or suggesting it was considered, you know, against defendant. But when co-defendant spoke to the police, he said that he kicked the man. When he spoke to his uncle, he said he stomped him. When he also spoke to his uncle, and I'm quoting from the record, he said, we fucked him up. Co-defendant was bragging to his uncle. And that's the difference between a stomp and a kick. When you're bragging to your uncle about how you beat a fellow or a rival gang member who argued with you in front of other people, you say, stomp. When you're talking to the police about what you did to a man who is at that time in the hospital suffering from severe head injuries, you say, I kicked him. And that's the difference. Because there's no functional difference in this case. Whether he stomped him or kicked him or nudged him with his foot, this man had his brain, his brain was sheared. He never woke up. He never regained consciousness. He was bleeding from his face. So you can call it a stomp. You can call it a kick. The result is the same. The man died as a result of the force of these injuries. And that's what the judge took account of. Exactly, Your Honor. He did. And also, when we're looking at the judge's statement about the stomping, he was not making a finding that any one person kicked or stomped the victim. He was not making a finding that defendant was accountable. When he talked about accountability, he said, defendant is accountable for this man's acts, not for his statement that we stomped him. And when the judge was discussing the use of the word stomp, he immediately indicated where he, you know, found that word, where in the testimony he found it. He found it in defendant's testimony. And that shows that he was singling out that action towards co-defendant and not attributing it towards defendant. All of the evidence in this case, in the light most favorable to the prosecution, indicates that this was a first-degree murder and that the trial court's finding was proper. If there are no further questions from this court, we would ask that you affirm this defendant's conviction. Thank you, Ms. Gibbs. Mr. Rayna, rebuttal. Excuse me. Just briefly, Your Honors. The State, I mean, just now, in arguing, the State is still relying on proof of knowledge, the co-defendant's inadmissible hearsay statement. They talked about it repeatedly through their argument about how the co-defendant said he fucked them up and they thought they caused harm. This is not evidence that was admissible against Mr. Castillo. And the question, the underlying question is knowledge. I don't think that was her argument. Her argument was that there was a characterization to the uncle, but it doesn't make any difference in that a kick and a stomp and the other, it's all the same. And that's what he took account of. You know, because the uncle used the word stomp, he wasn't using that specifically, but it has no effect that those words had been used and that was not against your client. I understand that aspect of the argument. I would just say that a stomp is different than a kick and that that was what the judge actually considered. And the question here is not whether the decedent died of injuries caused by the defendants. The question is whether the defendants would have known that what they did was practically certain to cause death or great bodily harm. And the nature of the incident, the use of bare fists and no weapons, a short incident, is not the type of nature under Jones and Langel that would demonstrate knowledge on their part. The bleeding that the police officer testified to did not happen. You know, the officer arrived, I think it was an hour and a half or so. We don't really know when this beating happened, but assuming it happened around 10, which is corroborated by my client's statement and Victor Dennis, the witness, but contradicted by some other evidence. I think the police arrived around 1130 or so. So it's possible there are internal injuries that they could have been bleeding out by that time. But again, the evidence of the external injuries would not have provided Mr. Castillo or Mr. Rodriguez with knowledge that what they were doing was likely to cause the severity of damage that they caused. And if there are no further questions, your Honor is asked to reduce the level of conviction and remand for a new sentencing hearing. All right. Thank you, Mr. Reyna. Thank you. Thank you both for your arguments here today and your briefs. And we will take the case under advisement.